UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| IN RE: TESTOSTERONE REPLACEMENT THERAPY PRODUCTS LIABILITY LITIGATION | MDL No. 2545 <br><br> Master Docket Case No. 1:14-cv-01748 <br><br> Honorable Matthew F. Kennelly |
| JERRY LONG <br><br><br>         Plaintiff, <br> vs. <br><br> ACTAVIS, PLC., <br> ACTAVIS PHARMA, INC. f/k/a/ WATSON PHARMACEUTICALS, INC., <br> WATSON LABORATORIES, INC., AND ANDA, INC. <br><br>         Defendants. | COMPLAINT AND JURY DEMAND <br><br> Civil Action NO.:_____ |

## COMPLAINT

Plaintiff, Jerry Long, by and through the undersigned counsel, hereby sues Defendants Actavis, Plc., Actavis, Inc. f/k/a Watson Pharmaceuticals, Inc., Watson Laboratories, Inc., and Anda, Inc. ("Defendants") and alleges as follows:

## I. PROCEDURAL AND FACTUAL BACKGROUND

### A. INTRODUCTION

1. This case involves the prescription drug Androderm® (hereinafter sometimes referred to as "TRT product"), which is a patch manufactured, sold, distributed and promoted by Defendants as a testosterone replacement therapy.

2. Defendants failed to conduct adequate pre- and post-market safety testing and research to ensure that Androderm® was safe for its intended use and failed to adequately warn

physicians about each of the risks associated with Androderm® and the monitoring regimen required to ensure patient safety

3.    Defendants misrepresented, concealed, and omitted material facts regarding the safety and efficacy of Androderm® as a treatment for hypogonadism and a condition they refer to as "low testosterone" or "Low-T."

4.    Androderm® causes serious injury and bodily harm. For example, Androderm® causes the hematocrit level to increase, thereby thickening the blood. This effect, if not monitored regularly and controlled properly, can lead to life threatening heart attacks, strokes and thrombotic events.

5.    Defendants engaged in aggressive direct-to-consumer and physician marketing and advertising campaigns to grow the market for Androderm®. For example, Defendants' Androderm® website indicates that it is "For men with low testosterone," a condition which the Androderm® website claims is largely caused by the aging process. The Androderm® website also represents that Androderm® is "highly effective" and that its design ensures proper dosing and minimized risks.

6.    As a result of Defendants' aggressive and misleading marketing campaign, taken together with the marketing campaigns of other testosterone supplement manufacturers, medical diagnoses of "Low T" have increased exponentially.  It is estimated that between 2001 and 2011, testosterone prescriptions tripled among men older than 40. Walk-in-clinics have sprung up across the country and sales are expected to more-than triple from $1.6 million to $5 billion by 2017. Yet the New England Journal of Medicine has warned that only 2 percent of men older than 40 should actually be receiving testosterone replacement therapy.

7.      As recent safety studies demonstrate, consumers of Androderm® were misled as to the drug's safety and efficacy. In fact, a study released in November 2013 of more than 8,000 men treated in the Veterans Health Administration found testosterone therapy increased the risk of heart attack, stroke, and death by almost 30 percent.

8.      As a result of Defendants' misconduct, thousands of men, including Plaintiff, have suffered severe injuries, including but not limited to life-threatening cardiac events, strokes, and thrombolytic events.

**B. PARTIES**

9.      Plaintiff Jerry Long, is a natural person and a citizen of the State of Louisiana, residing in Franklinton, LA. Plaintiff used the prescription Androderm® as prescribed and directed by his physician.

10.      Defendant Actavis, Plc is a foreign corporation organized and existing under the laws of Ireland with its global headquarters located at 1 Grand Canal Square, Docklands, Dublin 2, Ireland. Actavis, Plc also has administrative headquarters located at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. At all relevant times herein, Actavis, Plc was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm® in the State of Louisiana. Actavis, Plc has conducted business and derived substantial revenue from within the State of Louisiana.

11.      Defendant Actavis Pharma, Inc., formerly known as Watson Pharmaceuticals, Inc., is a domestic corporation organized and existing under the laws of the state of Nevada and maintains its principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. By way of background, Watson Pharmaceuticals, Inc. acquired Actavis Group in 2012 and announced shortly thereafter that, as of January 2013, it would

change its name to Actavis Pharma, Inc. Watson Pharmaceuticals, Inc. acquired the original manufacturer of Androderm®, TheraTech, Inc., in 1999. At all relevant times herein, Actavis Pharma, Inc. f/k/a Watson was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm® in the State of Louisiana. The current registered agent is C T Corporation System located at 1108 E. South Union Ave, Midvale, UT 84047. Actavis Pharma, Inc. f/k/a Watson Pharmaceuticals, Inc. has conducted business and derived substantial revenue from within this state and Plaintiff's resident state of Louisiana.

12.     Defendant Watson Laboratories, Inc., is a domestic corporation organized and existing under the laws of the state of Delaware and previously operated at 577 Chipeta Way, Salt Lake City, UT 84108. They currently maintain its current principal place of business at Morris Corporate Center III, 400 Interpace Parkway, Parsippany, New Jersey 07054. At all relevant times herein, Defendant Watson Laboratories, Inc., a subsidiary of Actavis, Inc, was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm® in the State of Louisiana. The current registered agent is C T Corporation System located at Corporation Trust Center, 1209 Orange St., Wilminton, DE 19801. Watson Laboratories, Inc. has conducted business and derived substantial revenue from Plaintiff's resident state of Louisiana.

13.     Defendant Anda, Inc. is a domestic corporation organized and existing under the laws of the state of Florida and maintains its principal place of business at 2915 Weston Road, Weston, Florida, 33331. At all relevant times herein, Defendant Anda, Inc., a subsidiary of Actavis, Plc, was engaged in the research, development, manufacture, sales, marketing, and/or distribution of pharmaceutical products, including Androderm® in the State of Louisiana. The

4

current registered agent is C T Corporation System located at 1200 South Pine Island Rd, Plantation, FL 33324. Anda, Inc. has conducted business and derived substantial revenue from Plaintiff's resident state of Louisiana.

## C. JURISDICTION AND VENUE

14.     This Action is being filed in the United States District Court for the Northern District of Illinois Eastern Division pursuant to Case Management Order No. 12[1] which permits the direct filing of cases in this Court which would be subject to transfer to MDL 2545 if filed in another jurisdiction.

15.     The United States District Court for the Eastern District of Louisiana has jurisdiction over Defendants and this action pursuant to 28 U.S.C. § 1332 because there is complete diversity of citizenship between Plaintiff and Defendants and because the amount in controversy between Plaintiff and Defendant exceeds $75,000, exclusive of interest and cost, and because, among other reasons, Defendant has significant contacts with this district by virtue of doing business within this judicial district.

16.     Venue is proper within the United States District Court for the Eastern District of Louisiana pursuant to 28 U.S.C. § 1391(b)(1) because Plaintiff resides in this district and because a substantial part of the acts and/or omissions giving rise to these claims occurred within this district.

## D. FACTUAL BACKGROUND

### 1.     General Allegations

17.     This action is for damages brought on behalf of Plaintiff who was prescribed and supplied with, received and who took and applied the prescription drug Androderm®, as tested,

---

[1] Case Management Order No. 12 Regarding the Filing of Actions in the Northern District of Illinois or Directly in the MDL Proceedings, 14-cv-01748, Doc. No. 440, filed October 24, 2014.

studied, researched, evaluated, endorsed, designed, formulated, compounded, manufactured, produced, processed, assembled, inspected, distributed, marketed, labeled, promoted, packaged, advertised for sale, prescribed, sold or otherwise placed in the stream of interstate commerce by Defendants. This action seeks, among other relief, general and special damages and equitable relief for the injuries caused by this drug to Plaintiff.

18.    Defendants' wrongful acts, omissions, and fraudulent misrepresentations caused Plaintiff's injury and damages.

19.    At all times herein mentioned, the Defendants were engaged in the business of, or were successors in interest to, entities engaged in the business of research, licensing, designing, formulating, compounding, testing, manufacturing, producing, processing, assembling, inspecting, distributing, marketing, labeling, promoting, packaging and/or advertising for sale or selling the prescription drug Androderm® for the use and application by men, including, but not limited to, Plaintiff Jerry Long.

20.    At all times herein mentioned, Defendants were authorized to do business within Plaintiff's resident state of Louisiana.

21.    At all times herein mentioned, the officers and directors of Defendants participated in, authorized, and directed the production and promotion of the aforementioned product when they knew, or with the exercise of reasonable care should have known, of the hazards and dangerous propensities of said product and thereby actively participated in the tortious conduct which resulted in the injuries suffered by Plaintiff described herein.

22.    Plaintiff files this lawsuit within the applicable limitations period of first suspecting that said drugs caused the appreciable harm sustained by Plaintiff. Plaintiff could not, by the exercise of reasonable diligence, have discovered the wrongful case of Plaintiff's injuries

at an earlier time because the injuries were caused without perceptible trauma or harm, and when Plaintiff's injuries were discovered their cause was unknown to Plaintiff. Plaintiff did not suspect, nor did Plaintiff have reason to suspect, that Plaintiff had been injured, the cause of the injuries, or the tortious nature of the conduct causing the injuries, until less than the applicable limitations period prior to the filing of this action. Additionally, Plaintiff was prevented from discovering this information sooner because Defendants herein misrepresented and continue to misrepresent to the public and to the medical profession that the drug Androderm® is safe and free from serious side effects. In fact, Defendants' are still actively promoting Androderm® as safe and effective to treat low testosterone to this day. Defendants have fraudulently concealed facts and information that could have led Plaintiff to discover a potential cause of action.

### 2. Regulatory History and Approved Uses

23. Hypogonadism is a specific and recognized condition of the endocrine system, which in men may involve the diminished production or nonproduction of testosterone.

24. In 1994, when Theratech, Inc., the original manufacturer of Androderm®, asked for FDA approval of Androderm®, hypogonadism was considered to be a relatively uncommon condition among American men.

25. The U.S. Food and Drug Administration approved Androderm® on September 29, 1995 for the treatment of adult males who have low or no testosterone. Since receiving FDA approval, the Defendants, their subsidiaries, and their predecessors advertised and marketed Androderm® as safe and effective to treat low testosterone in men.

26. Androderm® is a patch gel containing 2, 2.5, 4, or 5 mg of testosterone, applied to the stomach, arms, back or thighs and enters the body through transdermal absorption.

27.    Testosterone is a primary androgenic hormone responsible for normal growth, development of the male sex organs, and maintenance of secondary sex characteristics. The hormone plays a role in sperm production, fat distribution, maintenance of muscle strength and mass, and sex drive.

28.    In men, testosterone levels normally begin a gradual decline after the age of thirty.

29.    The average testosterone levels for most men range from 300 to 1,000 nanograms per deciliter of blood (ng/dl).  However, testosterone levels can fluctuate greatly depending on many factors, including sleep, time of day, and medication.  Resultantly, many men who fall into the hypogonadal range one day will have normal testosterone levels the next.

30.    Androderm® may produce undesirable side effects to patients who use the drug, including but not limited to, death, cardiovascular events, stroke, and thrombotic events.

31.    In addition to the above, Androderm® has been linked to several severe and life changing medical disorders in both users and those who come into physical contact with users. Patients taking Androderm® may experience enlarged prostates and increased serum prostate-specific antigen levels.

32.    Secondary exposure to Androderm® can cause side effects in others, including women and children. For example, testosterone may also cause physical changes in women exposed to the drug and cause fetal damage with pregnant women who come into contact with Androderm®.

### 3.    Direct to Consumer Marketing and Promotion to Physicians for Unbranded/Off-Label Use.

33.    After Androderm® was approved by the FDA in 1995, Defendants and other testosterone supplement manufacturers engaged in media campaigns to convince men who were

experiencing the typical effects of the aging process that they were suffering from low testosterone, which could be treated with testosterone supplements, including Androderm®. The marketing campaign consisted of advertisements, promotional literature placed in healthcare providers' offices and distributed to potential Androderm® users, and online media including Defendants' website for Androderm®: www.myandroderm.com.

34.     Myandroderm.com asserts that 4 to 5 million otherwise healthy men experience low testosterone and encourages male visitors to get "a simple blood test" to determine whether they have low T or testosterone. The site also identifies a number of "symptoms" that it associates with low testosterone which are symptoms that are more commonly associated with aging, weight gain, and lifestyle.

35.     Defendants have also sought to convince primary care physicians that low testosterone levels are widely under-diagnosed and that conditions associated with normal aging could be caused by low testosterone levels.

36.     As part of their marketing campaign, Defendants promoted Androderm® as an easy to apply patch for testosterone replacement therapy. Defendants contrast their product's at-home patch with other topical testosterone supplements in that the patch protects against the transfer of testosterone to others and assures proper dosing. *See* Androderm Patches, *available at* http://www.myandroderm.com/androderm_patches.aspx#HighlyEffective (last visited March 26, 2014).

37.     Defendants' marketing campaign encouraged men to discuss testosterone replacement therapy with their doctors and consumers and their physicians relied on Defendants' promises of safety, effectiveness, and ease of use. Although prescription testosterone replacement

therapy has been available for years, millions of men who had never been prescribed testosterone flocked to their doctors and pharmacies.

38.     As a direct result of this marketing campaign, sales of replacement therapies have more than doubled since 2006 and are expected to triple to $5 billion by 2017 according to forecasts by Global Industry Analysts. *See* Shannon Pettypiece, Are Testosterone Drugs the Next Viagra?, May 10, 2012, Bloomberg Business Week, *available at:* http://www.businessweek.com/articles/2012-05-10/are-testosterone-drugs-the-next-viagra.

39.     However, a study published in the Journal of the American Medical Association ("JAMA") in August 2013 entitled "Trends in Androgen Prescribing in the United States, 2001 – 2011" indicated that many men who get testosterone prescriptions have no evidence of hypogonadism. For example, one third of men prescribed testosterone had a diagnosis of fatigue and one quarter of men had not had their testosterone levels tested before being prescribed with testosterone replacement therapy.

40.     The marketing campaign was successful in creating the belief by consumers and physicians that low testosterone affected a large number of men in the United States and that the use of Androderm® is safe for human use, even though Defendants knew or should have known this to be false, and even though Defendants had no reasonable grounds to believe them to be true.

41.     What consumers received, however, were not safe drugs, but a product which causes life-threatening injuries, including heart attacks, stroke, and thrombotic events.

42.     As a result of Defendants' advertising and marketing, and representations about its product, men in the United States pervasively seek out prescriptions for Androderm®.  If Plaintiff in this action had known the risks and dangers associated with Androderm®, Plaintiff

would not have taken Androderm® and consequently would not have been subject to its serious side effects.

43. Defendants expanded the indications for use by promoting and detailing "Low T" as an acquired form of hypogonadism, and advantaged intentional ambiguity in their product labeling as a basis for "label expansion" and "off-label" marketing, detailing, and promotion to physicians.

44. Defendants detailed and marketed Androderm® to physicians as a product approved and indicated for the treatment of age-related declines in testosterone levels and age-related symptoms.

45. Defendants denominated and characterized age-related declines in testosterone levels and age-related symptoms in men as "Low T," and used the "Low T" moniker to denote and connote that the presence of age-related declines in testosterone levels and age-related symptoms in men were a form of acquired hypogonadism.

46. The Defendants knew and understood the meaning of the terms "off-label" and "label expansion."

47. The Defendants knew and understood the FDA regulations pertaining to "off-label" marketing and promotion of an FDA-approved pharmaceutical product.

48. Defendants marketed, promoted, and detailed Androderm® for "off-label" use for the purpose of "label expansion," and detailed and promoted the product to physicians, and advertised the product to consumers and patients, under the rubric that "Low T" was an indication for clinical use of their TRT product.

49. A manufacturer may not introduce a drug into interstate commerce with an intent that it be used for an "off-label" purpose.

50.    A manufacturer misbrands a drug if the labeling, or any of the manufacturer's promotional and advertising materials, describe an intended use for the drug that has not been approved by the FDA.

51.    Promotional materials are misleading if they suggest that a drug is useful in the treatment of a broader range of conditions, or in a broader population of patients, than has been demonstrated by substantial evidence or substantial clinical experience.

52.    Promotional materials are misleading if they represent or suggest that a drug is more effective than has been demonstrated by substantial evidence or substantial clinical experience.

53.    Promotional materials are misleading if they fail to reveal facts that are material in light of the representations made, or with respect to the consequences that may result from the use of the drug as recommended or suggested by the materials.

54.    The FDA did not, and never has, approved Androderm® for the treatment of:

   a.    age-related declines in testosterone levels in men;

   b.    age-related symptoms;

   c.    mood disorders, including depression or "grumpiness" or inability to concentrate;

   d.    lack of sexual interest or decreased libido;

   e.    disorders of erectile function or erectile dysfunction;

   f.    loss of muscle mass; or,

   g.    bone strength or density abnormalities

   **4.    Adverse Events and Serious Health Risks Caused by TRT**

63.     There have been a number of studies associating testosterone use in men with an increased risk of serious injuries from blood clots and cardiovascular events.

64.     Testosterone replacement therapy involves the administration of exogenous testosterone into the male body in an attempt to raise the serum level of total testosterone. This is achieved through the application of a cream, gel or patch directly to the skin for transdermal absorption into the body. It can also be delivered into the body by subcutaneous injection or placement of a time-released pellet containing the drug.

65.     The absorption of exogenous testosterone into the male body can cause an increase in serum levels of testosterone, and it also results in an increase in hematocrit[2] and serum estradiol levels[3]. It can also cause increased platelet aggregation and vasoconstriction.

66.     Hematocrit is the proportion of total blood volume that is comprised of red blood cells. Erythrocytosis is an increase in the number of circulating red blood cells especially resulting from a known stimulus (like Testosterone). When a person's hematocrit level is raised through erythrocytosis, the resulting condition is called polycythemia, which simply means an elevated red blood cell count. The range for normal hematocrit levels in adult males is 44%-48%.

67.     The administration of exogenous testosterone causes a 7%-10% increase in hematocrit levels in adult males through the process of erythrocytosis.[4] An increase of hematocrit that is 7%-10% above normal range is a significant elevation and qualifies as polycythemia. This is a serious medical condition that requires treatment to prevent injury.

---

[2] Fernandez-Balsells, M., et al., Adverse Effects of Testosterone Therapy in Adult Men: A Systematic Review and Meta-Analysis. J Clin Endocrinol Metab, June 2010, 95(6):2560–2575.

[3] Finkelstein, JS, et al., Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men. N Engl J Med 2013;369:1011-22.

[4] Bachman, E., et al. Testosterone Induces Erythrocytosis via Increased Erythropoietin and Suppressed Hepcidin: Evidence for a New Erythropoietin/Hemoglobin Set Point. J Gerontol A Biol Sci Med Sci., 2013.

68.     Elevated hematocrit is an independent risk factor for stroke and it interacts synergistically with elevated blood pressure. In a published study[5] the cohort for men with a hematocrit level greater than or equal to 51% had a more than doubling of the risk of stroke (RR=2.5), and among males in the cohort who were also hypertensive there was a nine-fold increase in the risk of stroke for those with hematocrit greater than or equal to 51%.

69.     Elevated hematocrit is also an independent risk factor for adverse cardiovascular events. Using data from the Framingham Heart Study, researchers documented a strong, graded relationship between hematocrit level and the risk of developing heart failure. In 3,523 Framingham participants, aged 50-65, who were free of a history of heart failure at baseline and were followed prospectively for up to 20 years, individuals with a hematocrit level greater than or equal to 50% had almost double the risk of new-onset heart failure during follow-up, compared with those with a low hematocrit, even after adjustment for conventional risk factors for heart failure.[6]

70.     In another study of 680 males conducted over 28 years in Finland, the data showed that men with a hematocrit level greater than or equal to 50% were 2.4 times more likely to die from coronary heart disease than men with hematocrit levels of less than 50%. Even after adjusting for established coronary risk factors, the increased risk remained 1.8-fold for the higher hematocrit cohort.[7]

---

[5] Wannamethee G1, Perry IJ, Shaper AG, Haematocrit, hypertension and risk of stroke. J Intern Med. 1994 Feb;235(2):163-8.

[6] Coglianese, E., et al., Usefulness of the Blood Hematocrit Level to Predict Development of Heart Failure in a Community. Am J Cardiol. Jan 15, 2012; 109(2): 241–245. Published online Oct 12, 2011

[7] Kunnas, T, et al., Hematocrit and the risk of coronary heart disease mortality in the TAMRISK study, a 28-year follow-up. Prev. Med. Volume 49, Issue 1, July 2009, Pages 45–47.

71.     In yet another large, prospective study[8] in Norway, the data show a hazard ratio of 1.25 per 5% rise in hematocrit. In a category-based analysis, a hematocrit level in the upper 20th percentile was found to be associated with a 1.5-fold increased risk of venous thrombosis, and a 2.4-fold increased risk of unprovoked venous thromboembolism compared to men whose hematocrit was in the lower 40th percentile.

72.     An increase in the level of hematocrit also causes an increase in the viscosity of the blood. A 10.99% increase of hematocrit produces an increase of 1 unit relative viscosity, which means approximately a 20% increase in blood viscosity for a healthy individual.[9] An increase in blood viscosity is a known risk factor for ischemic heart disease[10], and it can cause hypertension as blood pressure increase will be 20% or vasodilation will be 4.66% in radius for the physiologic compensation of 20% increased viscosity. Hypertension is a known cause of atherosclerosis, heart failure, and stroke. Testosterone makes blood thick and viscous, which, in turn, can cause numerous health risks and injuries for patients.

73.     The major source of estradiol in men comes from the aromatization of testosterone (endogenous and/or exogenous) to estradiol. When men are given testosterone, either by application of an androgen gel or by injection, some of that testosterone is converted by the body (aromatized) to estradiol.[11] The increase of estradiol is in direct

---

[8] Braekkan SK, Mathiesen EB,et al., Hematocrit and risk of venous thromboembolism in a general population. The Tromso study. Haematologica. 2010 Feb; 95(2):270-5.
[9] Cinar, Y., et al., Effect of hematocrit on blood pressure via hyperviscosity. Am J Hypertens. 1999 Jul;12(7):739-43.
[10] Yarnell, JW, et al., Fibrinogen, viscosity, and white blood cell count are major risk factors for ischemic heart disease. The Caerphilly and Speedwell collaborative heart disease studies. Circulation. 1991 Mar;83(3):836-44.
[11] Glueck, CJ, et al., Thrombotic events after starting exogenous testosterone in men with previously undiagnosed familial thrombophilia. Trans. Res. Oct. 2011.

relation to the amount of the dose of exogenous testosterone delivered; the higher the dose of testosterone, the higher the level of serum estradiol.[12]

74.    In data gathered from 2,197 men who participated in the Honolulu Aging Study from 1991-1993, and who were followed for thromboembolic and hemorrhagic events until 1998, there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower.[13] This study revealed that estradiol blood levels greater than 34.1 pg/mL resulted in this more than doubling of stroke incidence. As a source of embolism, the authors noted that the prevalence of atrial fibrillation rose significantly from 1.0 to 4.4% from the bottom to the top estradiol quintiles.   Atrial fibrillation is a known cause of thrombus formation.

75.    If men have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant, then the estradiol can interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones.[14]

76.    In a study published in 2006, blood levels of estradiol were measured in 313 men whose average age was 58. Carotid artery intima-media thickness was measured at baseline and then three years later. After adjusting for other risk factors, men with higher levels of estradiol suffered a worsening thickening of their carotid artery wall. This led the researchers to conclude, "circulating estradiol is a predictor of progression of carotid artery intima-media thickness in

---

[12] Finkelstein, JS, et al., Gonadal Steroids and Body Composition, Strength, and Sexual Function in Men. N Engl J Med 2013;369:1011-22.

[13] Abbott, RD, et al., Serum Estradiol and Risk of Stroke in Elderly Men. Neurology 2007, 68:563-568.

[14] Glueck, CJ, et al., Testosterone, thrombophilia, thrombosis. Blood Coagulation and Fibrinolysis 2014, 25:00–00.

middle-aged men."[15]  These findings of a positive association between serum estradiol levels and intima-media thickening supports the notion that estrogens, besides possibly increasing the risk for thrombosis and thereby cardiovascular events, also have an important impact on atherogenesis in men.

77.    In a case control study of men in the Framingham cohort *supra*, serum estradiol levels were significantly increased in subjects with coronary heart disease.[16]

78.    Estradiol has a greater effect in the male heart through the regulation of gene expression that it does not in female hearts. This effect results in impaired contractile function of the heart in males with elevated levels of serum estradiol.[17] Impaired contractile function results in numerous cardiovascular injuries and disease.

79.    A study published in 2007 compared blood levels of testosterone and *estradiol* in men suffering acute myocardial infarction (heart attack) with those who had previously suffered a heart attack. Sex hormones were measured in patients presenting with acute heart attack, patients with old heart attack, and patients with normal coronary arteries. The results showed significantly higher levels of *estradiol* in both groups of heart attack patients compared with those without coronary disease.[18]  In another study,  men admitted to the hospital with acute heart attacks whose levels of sex hormones were evaluated. Compared with control patients,

---

[15] Tivesten, A., et al., Circulating Estradiol is an Independent Predictor of Progression of Carotid Artery Intima-Media Thickness in Middle-Aged Men, J CLIN ENDOCRINOL METAB, November 2006, 91 (11): 4433-4437.

[16] Phillips GB, Castelli WP, Abbott RD, et al., Association of Hyperestrogenemia and Coronary Heart Disease in Men in the Framingham Cohort, Am J Med, 1983 74:863-869.

[17] Kararigas, G., et al., Transcriptome Characterization of Estrogen-Treated Human Myocardium Identifies Myosin Regulatory Light Chain Interacting Protein as a Sex-Specific Element Influencing Contractile Function, JACC Vol. 59, No. 4, January 24, 2012, 2012:410-7.

[18] Mohamad MJ, Mohammad MA, Karayyem M, Hairi A, Hader AA. Serum levels of sex hormones in men with acute myocardial infarction. Neuro Endocrinol Lett. 2007 Apr;28(2):182-6.

*estradiol* levels in these heart attack patients were **180%** higher, while bioavailable testosterone levels were **nearly three times less** than those of control patients.[19]

80.      High testosterone levels enhance acute myocardial inflammation, adversely affecting myocardial healing and early remodeling, as indicated by increased cardiac rupture, and possibly causing deterioration of cardiac function after MI, and, conversely, estrogen seems to have no significant protective effect in the acute phase after MI.[20]

81.      Thromboxane A2 (TXA2) is a vasoconstrictor and platelet pro-aggregatory agent that has been implicated in the pathogenesis of cardiovascular disease.  Thromboxane A2 has been unequivocally implicated in a range of cardiovascular diseases, owing to its acute and chronic effects in promoting platelet aggregation, vasoconstriction and proliferation.  A study published in 1995 demonstrated that testosterone treatment was associated with a significant increase in the maximum platelet aggregation response and this effect may contribute to the thrombogenicity of androgenic steroids like testosterone.[21]

82.      In 2010, a New England Journal of Medicine Study entitled "Adverse Events Associated with Testosterone Administration" was discontinued after an exceedingly high number of men in the testosterone group suffered adverse events.

83.      In November of 2013, a JAMA study was released entitled "Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels", in which a large cohort of men who used testosterone taken from a

---

[19] Pugh PJ, Channer KS, Parry H, Downes T, Jone TH. Bio-available testosterone levels fall acutely following myocardial infarction in men: association with fibrinolytic factors. Endocr Res. 2002 Aug;28(3):161-73.

[20] Maria A. Cavasin , Zhen-Yin Tao , Ai-Li Yu , Xiao-Ping Yang; American Journal of Physiology - Heart and Circulatory PhysiologyPublished 1 May 2006Vol. 290no. H2043-H2050DOI: 10.1152/ajpheart.01121.2005

[21] Ajayi, A., et al., Testosterone Increases Human Platelet Thromboxane A2 Receptor Density and Aggregation Responses. Circulation. 1995; 91: 2742-2747.

database of the Veteran's Administration was compared against a cohort of men who did not use testosterone. The data showed that among the cohort who used testosterone, the testosterone therapy raised the risk of death, heart attack and stroke by about 30%.

84.     On January 29, 2014, a study was released in PLOS ONE entitled "Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men" which indicated that testosterone use doubled the risk of heart attacks in men over sixty five years old and men younger than sixty five with a comorbid condition.  The conclusion of this published study was that the risk of myocardial infarction following initiation of testosterone therapy prescription is substantially increased.

85.     In a study published in 2013[22], based on a systematic review and meta-analysis of placebo-controlled randomized trials of testosterone therapy among men lasting 12+ weeks reporting cardiovascular-related events, two reviewers independently searched, selected and assessed study quality with differences resolved by consensus. Additionally, two statisticians independently abstracted and analyzed data, and concluded that testosterone therapy increased the risk of a cardiovascular-related event. Their meta-analysis of the published literature also showed that the effect of testosterone therapy varied with source of funding. In trials not funded by the pharmaceutical industry the risk of a cardiovascular-related event on testosterone therapy was greater than in pharmaceutical industry funded trials. The study concluded that the existing body of published medical literature demonstrates that in trials not funded by the pharmaceutical industry, exogenous testosterone increased the risk of cardiovascular-related events, with corresponding implications for the use of testosterone therapy.

---

[22] Xu, L., et al., Testosterone therapy and cardiovascular events among men: a systematic review and meta-analysis of placebo-controlled randomized trials. BMC Medicine 2013, 11:108.

86.    In some patient populations, testosterone use can increase the incidence of adverse events and death by over 500%.

### 5.    Inadequate Warning and Labels

87.    Defendants' marketing strategy has been to aggressively market and sell Androderm® by misleading potential users and their physicians about the prevalence and symptoms of low testosterone and by failing to protect users from serious dangers that Defendants knew or should have known to result from use of their products.

88.    Defendants successfully marketed Androderm® by undertaking "disease awareness" marketing campaigns. These campaigns sought to create a consumer perception that low testosterone is prevalent among U.S. men and that symptoms previously associated with other physical and mental conditions, such as aging, stress, depression, and lethargy were actually attributable to "Low-T."

89.    The Defendants' advertising programs sought to create the image and belief by consumers that the use of Androderm® was a safe method of alleviating their symptoms, had few side effects and would not interfere with their daily lives, even though Defendants knew or should have known these to be false, and even though the Defendants had no reasonable grounds to believe them to be true.

90.    Defendants promoted and marketed Androderm® to physicians as a lifestyle drug that could treat a variety of symptoms caused by the normal aging process in males, including: erectile dysfunction; loss of libido; loss of athleticism; loss of muscle mass; fatigue; and mood swings.  Defendants overstated the benefits of testosterone as a treatment for lifestyle changes associated with the aging process despite the fact that the drug was never FDA approved for these uses.

91. Defendants purposefully downplayed, understated and outright ignored the health hazards and risks associated with using Androderm®. Defendants deceived potential users and their physicians by relaying positive information through the press, and manipulating the definition of hypogonadism and statistics of its occurrence in men to suggest widespread disease prevalence, while downplaying known adverse and serious health effects.

92. Defendants concealed material relevant information from potential Androderm® users, and their physicians, and minimized user and prescriber concern regarding the safety of their TRT product, including but not limited to its known propensity to drastically increase hematocrit and estradiol in users.

93. In particular, in the warnings Defendants give in their commercials, online and print advertisements, Defendants fail to mention any potential risk of cardiac event, stroke, pulmonary embolism or other dangerous side effects related to blood clotting and falsely represent that they adequately tested their TRT product for all likely side effects. The Defendants also fail to warn and instruct regarding the importance of adequate monitoring of hematocrit and estradiol levels.

94. The Defendants' prescribing information and medication guide contained within the package materials do not warn against stroke, pulmonary embolism, transient ischemic attack, cardiovascular disease, myocardial infarction, coronary heart failure, or any thromboembolic event not related to polycythemia.

95. The medication guide contained within the package materials instructs patients to tell their healthcare provider the following before initiating use of Androderm®:

• have breast cancer

• have or might have prostate cancer

• have urinary problems due to an enlarged prostate

• have heart problems

• have kidney or liver problems

• have problems breathing while you sleep (sleep apnea)

• have any other medical conditions

However, the prescribing information and medication guide contained within the package materials fail to instruct patients to tell their healthcare provider if they have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant. They also fail to instruct patients or physicians to be aware of the presence of comorbid conditions or pre-existing heart disease, which has been proven to double the risk in men under the age of 65 who use testosterone therapy.

96.     The prescribing information and medication guide contained within the package materials do warn that the use of Androderm® may result in increased red blood cell count, but do not instruct physicians or patients that they can increase a red blood cell count to the point that it more than doubles the risk for stroke, pulmonary embolism, ischemic heart disease, coronary heart failure, and myocardial infarction. The warning in regard to red blood cell count does not warn patients and their physicians that hematocrit levels can rise by as much as 10% above normal range, nor does it warn of the serious and life threatening risks that are associated with a red blood cell count that exceeds 50%, including the fact that individuals with a hematocrit greater than or equal to 51% have a doubling of the risk of stroke, new-onset heart failure, and coronary heart disease.

97.     The prescribing information contained within the package materials does instruct physicians to re-evaluate their patient's hematocrit 3 to 6 months after starting treatment, but they fail to warn patients and their physicians that Androderm® can cause dangerous increases in hematocrit much more rapidly, and also fail to instruct physicians to monitor their patient's hematocrit more frequently.

98.     The prescribing information and medication guide contained within the package materials fail to state that testosterone replacement therapy should not be administered to men who have an underlying inherited trait which increases their risk of blood clotting, particularly the Factor V Leiden mutation, the Prothrombin gene mutation, high Factor VIII, high homocysteine, or the lupus anticoagulant because the increase in serum estradiol caused by the drug can interact with the underlying clotting trait to produce blood clots in the legs, the lungs, the eyes, the brain, and the bones. They also fail to instruct physicians to screen all patients for underlying clotting traits before prescribing testosterone replacement therapy.

99.     The prescribing information and medication guide contained within the package materials do warn that use of the products may result in risk of blood clots in the veins, but they specifically limit this warning to "blood clots in the legs" and only warn against blood clots in the legs that form as a result of increased red blood cell count (polycythemia). There is no warning for blood clots in the veins other than "blood clots in the legs", nor is there any warning of blood clots resulting from causes other than polycythemia. Also, there are no warnings that blood clots in veins as a consequence of polycythemia could result in pulmonary embolism, or other injuries secondary to the formation of deep vein thrombosis in the legs or other parts of the body.

100.    The prescribing information and medication guide contained within the package materials fail to warn that use of the product may result in elevated levels of estradiol. They do not instruct physicians to monitor estradiol levels, nor do they provide any guidance to physicians or patients regarding the significant health risks associated with elevated levels of serum estradiol in men, including the fact that there was a two-fold excess risk of stroke for men who had serum estradiol levels in the top quintile versus those men whose estradiol levels were lower, and that estradiol blood levels greater than 34.1 pg/mL resulted in more than doubling of stroke incidence in men. There is also no warning that elevated serum estradiol levels resulting from use of the products can cause impairment of contractility of the heart.

101.    The prescribing information and medication guide contained within the package materials do not warn that use of the products may result in the formation of deep vein thrombosis, pulmonary embolism, stroke, infarction, coronary heart failure, cardiovascular disease, or myocardial infarction caused by elevated levels of estradiol.

102.    The prescribing information and medication guide contained within the package materials do not offer any warning of the very serious health risks for men over the age of 65 who use testosterone replacement therapy. There is no mention of the fact that there is a doubling of the risk of heart attacks in men over the age of 65 who use testosterone replacement therapy, despite the fact that the data supporting this finding has been available for years. Instead, the labels only state that the manufacturer lacks any information regarding the safety or efficacy of testosterone therapy for men over the age of 65. This absence of a warning fails to adequately advise and instruct patients and their physicians of the very serious health risks caused by the use of testosterone in this patient population.

24

103.    In November of 2013, Rebecca Vigen, Colin I. O'Donnell, Anna E. Barón, Gary K. Grunwald, et al. published as article in the Journal of the American Medical Association entitled Association of Testosterone Therapy with Mortality, Myocardial Infarction, and Stroke in Men with Low Testosterone Levels ["Vigen Paper"].

104.    The Vigen Paper concluded that: "Use of testosterone therapy in this cohort of veterans with significant medical comorbidities was associated with increased risk of mortality, MI, or ischemic stroke."   In fact, testosterone therapy increased the risk of death, heart attack, and stroke by approximately 30%.

105.    On January 29, 2014, William D. Finkle, Sander Greenland, Gregory K. Ridgeway John L. Adams, et al. published an article in PLOS ONE entitled Increased Risk of Non-Fatal Myocardial Infarction Following Testosterone Therapy Prescription in Men ["Finkle Paper"].

106.    The Finkle Paper demonstrated an increased risk of heart attack in men over age 65 years, and in men younger than 65 years with a prior history of heart disease.

107.    The increased incidence of heart attack and stroke was foreseeable at the time of the product launch by the Defendants of Androderm®.

108.    On June 19, 2014, and in response to post-market reports of venous blood clots unrelated to polycythemia in testosterone users, the United States Food & Drug Administration (FDA) announced that it was requiring manufacturers of testosterone to include a general warning in the drug labeling of all approved testosterone products about the risk of venous thromboembolism (VTE), including deep vein thrombosis (DVT) and pulmonary embolism (PE).

### FDA adding general warning to testosterone products about potential for venous blood clots

[06/19/2014] The U.S. Food and Drug Administration (FDA) is requiring manufacturers to include a general warning in the drug labeling of all approved testosterone products about the risk of blood clots in the veins. Blood clots in the veins, also known as venous thromboembolism (VTE), include deep vein thrombosis (DVT) and pulmonary embolism (PE). The risk of venous blood clots is already included in the labeling of testosterone products as a possible consequence of polycythemia, an abnormal increase in the number of red blood cells that sometimes occurs with testosterone treatment. Because there have been postmarket reports of venous blood clots unrelated to polycythemia, FDA is requiring a change to drug labeling of all testosterone products to provide a more general warning regarding venous blood clots and to ensure this risk is described consistently in the labeling of all approved testosterone products.

Because these clots occur in the veins, this new warning is not related to FDA's ongoing evaluation of the possible risk of stroke, heart attack, and death in patients taking testosterone products. We are currently evaluating the potential risk of these cardiovascular events, which are related to blood clots in the arteries and are described in the Drug Safety Communication posted on January 31, 2014.

Testosterone products are FDA-approved for use in men who lack or have low testosterone levels in conjunction with an associated medical condition. Examples of these conditions include failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy.

109.   As a result of this mandate by the FDA, the Defendants updated the prescribing information to provide the general warning required by FDA regarding DVT and PE, and also updated the medication guides to include the significant risk of PE.

110.   The marketing and promotion of the TRT product to patients and physicians overstated their benefits by creating the impression that they were a safe and effective treatment for a variety of aging-related conditions and symptoms, for which it was not FDA approved. This is misleading and fails to adequately warn physicians and patients about the numerous, life-threatening health risks associated with the use of Androderm®.

111.   As a result of Defendants' advertising and marketing, and representations about their products, men in the United States pervasively seek out prescriptions for Androderm®. If Plaintiff and his physician had known the risks and dangers associated with Androderm®, the physician would not have prescribed nor would Plaintiff would have taken Androderm® and consequently would not have been subject to its serious side effects; and/or, Plaintiffs'

physicians would have adequately monitored Plaintiff's hematocrit and estradiol levels, and, as a result, Plaintiff's injuries would have not otherwise have occurred

### 6. Case Specific Facts

112. Plaintiff, Jerry Long, was prescribed Androderm® 2/mg and used it as directed from approximately May 9, 2012 through November 2012.

113. Plaintiff was 64 (sixty-four) years of age when he was prescribed and used Androderm® for symptoms he attributed to low testosterone.

114. Plaintiff had no history of clotting events or stroke prior to taking testosterone.

115. Plaintiff was diagnosed with having suffered a stroke on or about June 8, 2012. Plaintiff was using Androderm® at the time of his stroke.

116. As a result of the stroke, for the rest of his life plaintiff Jerry Long must undergo regular testing, adhere to a restrictive diet, and take medication.

117. Plaintiff Jerry Long's physician would not have prescribed Androderm® to Plaintiff had he been advised of and warned of the risks of stroke caused by or increased with respect to the risk of harm by Androderm®.

118. Had Defendants properly disclosed the risks associated with testosterone, Plaintiff would have avoided the risk of stroke by either not using testosterone at all, severely limiting the dosage and length of use, and/or by closely monitoring the degree to which the drugs were adversely affecting his health.

119. After using Androderm®, Plaintiff Jerry Long suffered a stroke that was caused by his use of testosterone by the mechanism of injury as described above in Section I. D. 4.

120. The Androderm® Plaintiff Jerry Long used caused physical and emotional impairment which affected his personal and professional life.

121.   Plaintiff files this lawsuit within one (1) year of first suspecting that the Androderm® was the cause of appreciable harm sustained by Plaintiff, within one (1) year of first suspecting or having reason to suspect any wrongdoing, and within the applicable limitations period of first discovering their injuries and the wrongful conduct that cause such injuries. Plaintiff could not by the exercise of reasonable diligence have discovered any wrongdoing, nor could Plaintiff have discovered the causes of his injuries at an earlier time because some injuries occurred without initial perceptible trauma or harm, and when Plaintiff's injuries were discovered, their causes were not immediately known.

122.   Plaintiff did not suspect, nor did he have reason to suspect, that wrongdoing had caused his injuries, nor did Plaintiff have reason to suspect the tortious nature of the conduct causing the injuries, until recently and has filed the herein action well within the applicable statute of limitations period. Plaintiff had no knowledge of the defects in the Androderm® and the wrongful conduct of the Defendant as set forth herein, nor did Plaintiff have access to the information regarding other injuries and complaints in the possession of Defendant. Additionally, Plaintiff was prevented from discovering this information sooner because Defendant herein misrepresented and continue to misrepresent to the public, to the medical profession and to Plaintiff that the Androderm® is safe and free from serious defects and side effects and Defendant has fraudulently concealed facts and information that could have led Plaintiff to an earlier discovery of potential causes of action.

123.   As alleged herein, as a direct, proximate, and legal result of Defendants' negligence and wrongful conduct, and the unreasonably dangerous and defective characteristics of the drug testosterone, Plaintiff suffered severe and permanent physical and emotional injuries, including, but not limited to a stroke.  Plaintiff has endured pain and suffering, has suffered

economic loss, including incurring significant expenses for medical care and treatment and will continue to incur such expenses in the future. Plaintiff seeks actual and punitive damages from Defendant as alleged herein.

## II.     CAUSES OF ACTION

### FIRST CAUSE OF ACTION
### STRICT LIABILITY – FAILURE TO WARN

124.    Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

125.    The Defendants are liable under the theory of product liability as set forth in §§ 402A and 402B of the Restatement of Torts 2d.

126.    The Androderm® manufactured and/or supplied by Defendants was defective due to inadequate warnings or instructions because Defendants knew or should have known that the product created significant risks of serious bodily harm to consumers, and they failed to adequately warn consumers and/or their health care providers of such risks.

127.    Defendants failed to adequately warn consumers and/or their health care providers that Androderm® could cause heart attacks, strokes, pulmonary embolism, cardiovascular events and blood clots.

128.    Defendants failed to adequately warn consumers and/or their health care providers that while a patient was using Androderm® it was necessary to frequently monitor hematocrit and estradiol levels to prevent heart attacks, strokes, pulmonary embolisms, cardiovascular events and blood clots.

129.    The Androderm® manufactured and/or supplied by Defendants was defective due to inadequate post-marketing warnings or instructions because, after Defendants knew or should

have known of the risk of serious bodily harm from the use of Androderm®, Defendants failed to provide an adequate warning to consumers and/or their health care providers of the product, knowing the product could cause serious injury.

130.    As a direct and proximate result of Plaintiff's reasonably anticipated use of Androderm® as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by Defendants, Plaintiff suffered serious injury, harm, damages, economic and non-economic loss and will continue to suffer such harm, damages and losses in the future.

**SECOND CAUSE OF ACTION**
**NEGLIGENCE**

131.    Plaintiff adopts by reference each and every paragraph of the Complaint applicable to all counts of this Complaint, and each and every count of this Complaint as if fully copied and set forth at length herein.

132.    At all times herein mentioned, Defendants had a duty to properly manufacture, design, formulate, compound, test, produce, process, assemble, inspect, research, distribute, market, label, package, distribute, prepare for use, sell, prescribe and adequately warn of the risks and dangers of Androderm®.

133.    At all times material hereto, Defendants had actual knowledge, or in the alternative, should have known through the exercise of reasonable and prudent care, of the hazards and dangers of Androderm® to cause, or increase the harm of among other severe injuries, myocardial infarction, cerebrovascular accident, deep vein thrombosis and it sequelae, pulmonary embolism, and sudden cardiovascular death.

134.    Defendants had a duty of care when it undertook to provide comprehensive medical information to consumers and patients concerning "Low T" as a medical diagnostic

entity; and, to educate and inform consumers and patients about "Low T;" and, to provide consumers and patients with the means for self-diagnostic screening and in-home testing for "Low T."

135.    Defendants had a duty to disclose to physicians and healthcare providers the causal relationship or association of Androderm® to heart attack, stroke, deep vein thrombosis and its sequelae, pulmonary embolism, and sudden cardiac death.

136.    Defendant's duty of care owed to consumers and patients included providing accurate, true, and correct information concerning:

-hypogonadism and its diagnostic criteria;

-the FDA-approved indications for the clinical use of the Androderm® product;

-the clinical safety and effectiveness profiles of Androderm®; and,

-appropriate, complete, and accurate warnings concerning the adverse effects of Androderm®, including heart attack, stroke, pulmonary embolism, deep vein thrombosis and its sequelae, and sudden cardiac death.

137.    At all times herein mentioned, Defendants breaches its duty of care by negligently and carelessly manufactured, designed, formulated, distributed, compounded, produced, processed, assembled, inspected, distributed, marketed, labeled, packaged, prepared for use and sold Androderm® and failed to adequately test and warn of the risks and dangers of Androderm® as described herein.

138.    The Defendants negligently and carelessly disregarded the applicable regulations and industry standards regarding the prohibition against off-label marketing, misbranding and label expansion, and as a result millions of men, including the Plaintiff, were prescribed

Androderm® unnecessarily, and therefore needlessly exposed to serious health risks for which there were no or inadequate warnings.

139.    At all times material hereto, Defendants sought to mislead and misinform physicians concerning the FDA-approved uses for Androderm®, including Plaintiff's prescribing physician.    Specifically, the FDA had not approved Androderm® or any other testosterone-containing preparation for the treatment of "Low T."

140.    At all times material hereto, Defendants recklessly, intentionally, and knowingly detailed and promoted the testosterone-containing product Androderm® with the intent that men be prescribed testosterone therapy by physicians for "off-label" clinical indications.

141.    Despite the fact that Defendants knew or should have known that Androderm® caused unreasonable, dangerous side effects, Defendants continued to market Androderm® to consumers including Plaintiff, when there were safer alternative methods and/or no need to treat conditions such as loss of energy, libido erectile dysfunction, depression, loss of muscle mass and other conditions that Androderm® marketing materials claim are caused by "Low T".

142.    At all times material hereto, Defendants misbranded the Androderm® product on an on-going and continuous basis, and failed to warn physicians and patients that Androderm® was not approved for the treatment of "Low T" or age-related declines in testosterone or age-related symptoms in men.

143.    Defendants failed to disclose to physicians, consumers, and patients the known cardiovascular and cerebrovascular risks causally associated with Androderm® use.

144.    As marketed, detailed, and promoted to physicians, including Plaintiff's prescribing physician, Defendants failed to warn that Androderm® caused, or increased the risk of harm of, cardiovascular and cerebrovascular injuries, including myocardial infarction and

cerebrovascular accident, pulmonary embolism, deep vein thrombosis and its sequelae, and sudden cardiac death.

145.    Defendants knew or should have known that consumers such as Plaintiff would foreseeably suffer injury as a result of Defendants' failure to exercise ordinary care as described above.

146.    Defendants' negligence was a proximate cause of the Plaintiff's injuries, harm and economic loss which Plaintiff suffered, and will continue to suffer, as described and prayed for herein.

## THIRD CAUSE OF ACTION
## FOR BREACH OF IMPLIED WARRANTY

147.    Plaintiff incorporates by reference here each of the allegations heretofore set forth in this Complaint as though fully set forth herein.

148.    Prior to the time that the aforementioned products were used by Plaintiff, Defendants impliedly warranted to Plaintiff and Plaintiff's agents and physicians that Androderm® was of merchantable quality and safe and fit for the use for which it was intended.

149.    Plaintiff was and is unskilled in the research, design and manufacture of the products and reasonably relied entirely on the skill, judgment and implied warranty of the Defendants in using Androderm®.

150.    Androderm® was neither safe for its intended use nor of merchantable quality, as warranted by Defendants, in that Androderm® has dangerous propensities when used as intended and will cause severe injuries to users.

151.    As a result of the abovementioned breach of implied warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## FOURTH CAUSE OF ACTION
## FOR BREACH OF EXPRESS WARRANTY

152.   Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though fully set forth here.

153.   At all times mentioned, Defendants expressly represented and warranted to Plaintiff and Plaintiff's agents and physicians, by and through statements made by Defendants or their authorized agents or sales representatives, orally and in publications, package inserts and other written materials intended for physicians, medical patients and the general public, that Androderm® is safe, effective, fit and proper for its intended use. Plaintiff purchased Androderm® relying upon these warranties.

154.   In utilizing Androderm®, Plaintiff relied on the skill, judgment, representations, and foregoing express warranties of Defendants. These warranties and representations were false in that Androderm is unsafe and unfit for its intended uses.

155.   As a result of the abovementioned breach of express warranties by Defendants, Plaintiff suffered injuries and damages as alleged herein.

## FIFTH CAUSE OF ACTION
## FRAUD

156.   Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though set forth fully herein.

157.   Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Androderm®, and up to the present, knew that their product could cause an increase in hematocrit in patients to a level that more than doubles their risk for stroke, heart attack, and clot formation that could result in pulmonary embolism, and as result of published, peer-reviewed medical literature knew that the use of its product could

result in a dramatic increase in serum estradiol levels, yet the Defendants willfully deceived Plaintiff by concealing from them, Plaintiff's physicians and the general public, the true facts concerning Androderm®, which the Defendants had a duty to disclose.

158.    At all times herein mentioned, Defendants conducted a sales and marketing campaign to promote the sale of Androderm® and willfully deceive Plaintiff, Plaintiff's physicians and the general public as to the benefits, health risks and consequences of using Androderm®. Defendants knew of the foregoing, that Androderm® is not safe, fit and effective for human consumption, that using Androderm® is hazardous to health, and that Androderm® has a serious propensity to cause serious injuries to its users, including but not limited to the injuries Plaintiff suffered.

159.    Defendants knowingly, falsely, deceptively, and inaccurately designated the physiologic decrease in men's testosterone levels and the age-related symptoms men experience with aging as a form of acquired hypogonadism with the intent to deceive physicians into prescribing Androderm® for "off-label" indications for clinical use; and, to engage in "label expansion" of the Androderm® product; and, to drive increasing consumer and patient demand for Androderm® prescriptions.

160.    Defendants, from the time they first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed Androderm®, and up to the present, willfully deceived Plaintiff by concealing from them, Plaintiff's physicians and the general public, the true facts concerning Androderm®, which the Defendants had a duty to disclose.

161.    Defendants knowingly, falsely, deceptively, and inaccurately designated and represented that the physiologic decline in men's testosterone levels and the age-related symptoms men experience with advancing age, as a form of "acquired hypogonadism" with the

intent to confuse and deceive consumers and patients, and to foster the belief by consumers and patients, including Jerry Long, that they harbored a "disease" or pathologic medical condition that was appropriately treated with the Androderm® product.

162.     Defendants concealed and suppressed the true facts concerning Androderm®, and the actual disease for which it has been FDA approved to treat (Hypogonadism), with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff physicians would not prescribe Androderm®, and Plaintiff would not have used Androderm®, if they were aware of the true facts concerning its dangers.

163.     Consumers, including Jerry Long, required, and should have been provided with, truthful, accurate, and correct information concerning the FDA-approved indications for the clinical use for Androderm® and the clinical safety and effectiveness profiles for Androderm®, including information concerning the "off-label" use of the Androderm® product.

164.     Plaintiff relied on the fraudulent and deceptive representations made by the Defendant to his detriment.  Specifically, Plaintiff relied on representations that "LowT" was an actual disease that required medical treatment and use of prescription testosterone, that Androderm® was FDA approved to treat a condition called "LowT", and that the Defendant's testosterone drug was a safe and effective treatment for his "LowT".

165.     Plaintiff, Jerry Long, would not have sought or continued treatment for "Low T" or administered Androderm® had he been provided with adequate, true, accurate, and correct information by Defendants about the risks of cardiovascular events and cerebrovascular accident causally associated with the use of Androderm®, and the fact that "Low T" was not an FDA-approved indication for clinical use of Androderm®.

166.     Plaintiff, Jerry Long would not have sought or continued treatment for "Low T," or administered Androderm®, had he been provided with adequate, true, accurate, and correct information by Defendants, including information that there were no proven clinical profiles of safety or effectiveness for the use of Androderm® to treat "Low T."

167.     During the detailing, marketing, and promotion to physicians, neither Defendants nor the co-promoters who were detailing Androderm® on behalf of Defendants warned physicians, including Plaintiff's prescribing physician, that Androderm® caused or increased the risk of harm of cerebrovascular accident and neurologic injuries.

168.     Defendants concealed and suppressed the true facts concerning Androderm® with the intent to defraud Plaintiff, in that Defendants knew that Plaintiff physicians would not prescribe Androderm®, and Plaintiff would not have used Androderm®, if they were aware of the true facts concerning its dangers.

169.     As a result of Defendants' fraudulent and deceitful conduct, Plaintiff suffered injuries and damages as alleged herein.

## SIXTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

170.     Plaintiff incorporates by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

171.     From the time Androderm® was first tested, studied, researched, evaluated, endorsed, manufactured, marketed and distributed, and up to the present, Defendants made misrepresentations to Plaintiff, Plaintiff's physicians and the general public, including but not limited to the misrepresentation that Androderm® was safe, fit and effective for human consumption. At all times mentioned, Defendants conducted a sales and marketing campaign to

promote the sale of Androderm® and willfully deceived Plaintiff, Plaintiff's physicians and the general public as to the health risks and consequences of the use of the abovementioned product.

172.     The Defendants made the foregoing representation without any reasonable ground for believing them to be true. These representations were made directly by Defendants, by sales representatives and other authorized agents of Defendants, and in publications and other written materials directed to physicians, medical patients and the public, with the intention of inducing reliance and the prescription, purchase and use of the subject product.

173.     The representations by the Defendants were in fact false, in that Androderm® is not safe, fit and effective for human consumption, using Androderm® is hazardous to health, and Androderm® has a serious propensity to cause serious injuries to users, including but not limited to the injuries suffered by Plaintiff.

174.     The foregoing representations by Defendants, and each of them, were made with the intention of inducing reliance on the prescription, purchase and use of Androderm®.

175.     In reliance of the misrepresentations by the Defendants, and each of them, Plaintiff was induced to purchase and use Androderm®. If Plaintiff had known of the true facts and the facts concealed by the Defendants, Plaintiff would not have used Androderm®. The reliance of Plaintiff upon Defendants' misrepresentations was justified because such misrepresentations were made and conducted by individuals and entities that were in a position to know the true facts.

176.     As a result of the foregoing negligent misrepresentations by Defendants, Plaintiff suffered injuries and damages as alleged herein.

<u>**SEVENTH CAUSE OF ACTION**</u>
<u>**DESIGN DEFECT**</u>

38

177. Defendant participated in the manufacture, sale and marketing of an exogenous testosterone drug, Androderm®, that was FDA approved to treat a specific medical condition called Hypogonadism, which is defined as a condition in which a male produces no or very low testosterone in conjunction with an associated medical condition, such as failure of the testicles to produce testosterone for reasons such as genetic problems or chemotherapy.

178. The Defendant manufactured, sold and promoted Androderm® to treat a non-existent medical condition that it called "LowT", which was a name it created for the constellation of symptoms experienced by men as a result of the normal aging process. In essence, the Defendant marketed and sold testosterone as a lifestyle drug meant to make men feel younger and increase libido.

179. Defendant manufactured, sold, and promoted this drug which contained a defective condition because the design was defective and unsafe in that it caused serious injuries and death as the result of the formation of blood clots and adverse cardiovascular events, including but not limited to deep vein thrombosis, pulmonary embolism, stroke, ischemic injuries, infarctions, coronary heart failure, and cardiovascular disease.

180. This design defect made the drug unreasonably dangerous, yet the Defendant knowingly introduced the drug into the market.

181. The drug as manufactured by the Defendant remained unchanged and was in the same condition at the time of the injury hereafter alleged.

182. As a direct and proximate cause of Defendant's manufacture, sale and promotion of the defectively designed drug, Plaintiff sustained permanent injury.

### EIGHTH CAUSE OF ACTION
### LOUISIANA PRODUCTS LIABILITY ACT, La. R.S. 9:2800.51, *et. seq.*

183.    Plaintiffs incorporate by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

184.    The Plaintiff's injuries and damages were caused by a characteristic of Androderm® that rendered the product unreasonably dangerous because the Plaintiff's injuries and damages arose from a reasonably anticipated use of the product by the Plaintiff, Jerry Long.

185.    At all times material hereto, Androderm® was expected to reach, and did reach, consumers in the State and throughout the United States, including Jerry Long, without substantial change in the condition in which it was sold.

186.    That at the time Androderm® left the Defendants' control, the product deviated in a material way from the manufacturer's specifications or performance standards for the product or from otherwise identical products manufactured by the Defendants and as such was unreasonably dangerous in construction or composition.

187.    That Androderm® had an inadequate warning because at the time it left Defendants' control, the product possessed a characteristic that may cause damage and the Defendants failed to use reasonable care to provide an adequate warning of such characteristics and its danger to users and handlers of the product, thereby rendering the product unreasonably dangerous.

188.    That the unreasonably dangerous characteristics of Androderm® were beyond that which would be contemplated by the ordinary user such as Plaintiff Jerry Long, with the ordinary knowledge common to the community as to the product's characteristics.

189.    That in the alternative, the Defendants, after Androderm® left their control, acquired knowledge of a characteristic of the product that may cause damage and the danger of such characteristic, or the Defendants would have acquired such knowledge had they acted as a

reasonably prudent manufacturer, and thus Defendants are liable to Plaintiff, Jerry Long, due to their subsequent failure to use reasonable care to provide an adequate warning of such a characteristic and its dangers to users of the product, including Jerry Long.

190.    That Androderm® was unreasonably dangerous because it did not conform to an express warranty made at any time by the Defendants about the product and the express warranty induced the Plaintiff Jerry Long to use the product and the Plaintiff's damages were proximately caused because the express warranty was untrue.

191.    That at the time Androderm® left the Defendants' control, the Defendants, in light of then existing reasonably available scientific and technological knowledge, knew of the design characteristic that caused the damage and the danger of such characteristic.

192.    That at the time Androderm® left the Defendants' control, the Defendants, in light of then existing reasonably available scientific and technological knowledge, knew of the existing technologically and economically safer alternative design characteristic, a design safer than the design that caused the damage and the danger of such characteristic.

193.    As a direct and proximate cause of the Defendants' aforesaid actions and the Plaintiff's reasonably anticipated use of Androderm® as manufactured, designed, sold, supplied, marketed and/or introduced into the stream of commerce by the Defendants, the Plaintiffs suffered serious personal injuries, which are permanent in nature including but not limited to physical pain and suffering, expenses for medical treatment and hospitalization and loss of earnings and impaired earning capacity as well as any and all damages that are reasonable in the premises.

**NINTH CAUSE OF ACTION**
**REDHIBITION- La. C.C.P. Art. 2520**

194.    Plaintiff incorporates by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

195.    The Defendants, as manufacturers and sellers of the defective product, are responsible for damages caused by failure of their product to conform to well-defined standards.

196.    In particular, the product contains a vice or defect which rendered it useless or its use so inconvenient that a reasonable buyer would not have purchased it.

197.    The Defendants manufactured, sold and promoted Androderm® and placed the product into the stream of commerce. Under Louisiana law, the seller and the manufacturer warrants the buyer against redhibitory defects or vices in the things sold. La. C.C.P. Art. 2520.

198.    The product, Androderm®, as sold and promoted by the Defendants possessed a redhibitory defect because it was not manufactured and marketed in accordance with industry standards and/or was unreasonably dangerous as described above, which rendered the product useless or its use so inconvenient that it must be presumed that a buyer would not have bought the product had he known of the defect.

199.    Pursuant to La. C.C.P. Art. 2520, the Plaintiff is entitled to obtain a rescission of the sale of the subject product.

200.    As the manufacturers of the product, under Louisiana law, the Defendants are deemed to know that the product contained a redhibitory defect. La. C.C.P. Art. 2520. The Defendants are liable as bad faith sellers for selling a defective product with knowledge of a defect and thus are liable to the Plaintiffs for the price of the subject product, with interest from the purchase date, and attorneys' fees.

**TENTH CAUSE OF ACTION**
**VIOLATION OF UNFAIR TRADE PRACTICES**
**CONSUMER PROTECTION LAW § 51:1401, *et seq***

201.    Plaintiff incorporates by reference herein each of the allegations set forth in this Complaint as though fully set forth herein.

202.    The Defendants have a statutory duty to refrain from unfair trade practices in the design, development, manufacture, promotion and sale of Androderm®.

203.    Had the Defendants not engaged in the deceptive conduct described herein, the Plaintiff Jerry Long would not have purchased and/or paid for Androderm®, and would not have incurred related medical costs. Specifically, the Plaintiff, his physician, and the Plaintiff's physician's staff were misled by the deception conduct described herein.

204.    The Defendants' deceptive, unconscionable, and/or fraudulent representations and material omissions to patients, physicians and consumers, including the Plaintiff, constituted unfair trade practices in violation of the state consumer protection statute listed above.

205.    The Defendants engaged in wrongful conduct while at the same time obtaining, under false pretenses, substantial sums of money from the Plaintiff for Androderm® that they would not have paid had Defendants not engaged in unfair trade practices.

206.    The Plaintiff was injured by the cumulative and indivisible nature of Defendants' conduct. The cumulative effect of the Defendants' conduct directed at patients, physicians and consumers was to create a demand for and sell Androderm®. Each aspect of the Defendants' conduct combined to artificially create sales of testosterone.

207.    The Defendants are liable to the Plaintiffs for their unfair and deceptive acts for the Plaintiff's serious personal injuries, which are permanent in nature including but not limited to physical pain and suffering, expenses for medical treatment and hospitalization and loss of earnings and impaired earning capacity as well as any and all damages that are reasonable in the premises, as well as attorneys' fees incurred herein.

## PUNITIVE DAMAGES ALLEGATIONS

208. Plaintiff incorporates by reference here each of the allegations set forth in this Complaint as though fully set forth herein.

209. The acts, conduct, and omissions of Defendants, as alleged throughout this Complaint were willful and malicious. Defendants committed these acts with a conscious disregard for the rights of Plaintiff and other Androderm® users and for the primary purpose of increasing Defendants' profits from the sale and distribution of Androderm®. Defendants' outrageous and unconscionable conduct warrants an award of exemplary and punitive damages against Defendants in an amount appropriate to punish and make an example of Defendants.

210. Prior to the manufacturing, sale, and distribution of Androderm®, Defendants knew that said medication was in a defective condition as previously described herein and knew that those who were prescribed the medication would experience and did experience severe physical, mental, and emotional injuries. Further, Defendants, through their officers, directors, managers, and agents, knew that the medication presented a substantial and unreasonable risk of harm to the public, including Plaintiff and as such, Defendants unreasonably subjected consumers of said drugs to risk of injury or death from using Androderm®.

211. Despite its knowledge, Defendants, acting through its officers, directors and managing agents for the purpose of enhancing Defendants' profits, knowingly and deliberately failed to remedy the known defects in Androderm® and failed to warn the public, including Plaintiff, of the extreme risk of injury occasioned by said defects inherent in Androderm®. Defendants and their agents, officers, and directors intentionally proceeded with the manufacturing, sale, and distribution and marketing of Androderm® knowing these actions

would expose persons to serious danger in order to advance Defendants' pecuniary interest and monetary profits.

212.    Defendants' conduct was despicable and so contemptible that it would be looked down upon and despised by ordinary decent people, and was carried on by Defendants with willful and conscious disregard for the safety of Plaintiff, entitling Plaintiff to exemplary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment against Defendants jointly and severally as follows:

(a)    For general damages in a sum in excess of the jurisdictional minimum of this Court;

(b)    For medical, incidental, and hospital expenses according to proof;

(c)    For pre-judgment and post-judgment interest as provided by law;

(d)    For full refund of all purchase costs Plaintiff paid for testosterone;

(e)    For compensatory damages in excess of the jurisdictional minimum of this Court;

(f)    For consequential damages in excess of the jurisdictional minimum of this Court;

(g)    For punitive damages in an amount in excess of any jurisdictional minimum of this Court and in an amount sufficient to impress upon Defendants the seriousness of their conduct and to deter similar conduct in the future;

(h)    For attorneys' fees, expenses, and costs of this action; and

(i)    For such further relief as this Court deems necessary, just, and proper.

## DEMAND FOR JURY TRIAL

Plaintiff demands a trial by jury on all counts and as to all issues.

Dated: November 4, 2014                  Respectfully submitted,

                                         /s/ Gregory S. Spizer

                                         Gregory S. Spizer, Esquire
                                         **ANAPOL SCHWARTZ**
                                         1710 Spruce Street
                                         Philadelphia, PA 19103
                                         Telephone: 215-790-4578
                                         Facsimile : 215-875-7722
                                         gspizer@anapolschwartz.com

                                         **Attorneys for Plaintiff**

46